## Case No. 7,865.

### In re KLEIN.

[1 How. (42 U. S.) 277, note.]

Circuit Court, D. Missouri. 1843.[1]

BANKRUPTCY — AMERICAN AND ENGLISH DISTINGUISHED — BANKRUPTCY BEFORE THE CONSTITUTION—VIOLATION OF OBLIGATION OF CONTRACTS—POWER TO RELEASE BANKRUPT.

[1. The spirit of the American law upon the subject of bankruptcies is radically at variance with that of the English. By the English law, only "a fraudulent trader," upon the petition of his creditors, could be a bankrupt. In America, any debtor, upon the petition of his creditors, or upon his own petition, may be a bankrupt. This latter was the construction given to bankruptcy in the states of the American Union before the adoption of the federal constitution.]

[Quoted in Silverman's Case, Case No. 12.855. Cited in Re Reynolds. Id. 11.723; Re Reiman. Id. 11,673; Re California Pac. R. Co., Id. 2,315.]

[2. The power given by the constitution to congress to regulate bankruptcy, means bankruptcy in the American sense, and comprehends both voluntary and involuntary bankruptcy.]

[3. Congress is not prohibited by the constitution from passing laws violating the obligation of contracts. Therefore the act of 1841 (5 Stat. 440), which provides that in certain cases a bankrupt may be discharged from his debts, is not unconstitutional.]

[Quoted in Silverman's Case, Case No. 12.855. Cited in Re Reynolds. Id. 11.723; Re Reiman. Id. 11,673; Re California Pac. R, Co., Id. 2,315.]

[Appeal from the district court of the United States for the district of Missouri.

[In the matter of Edward Klein, a bankrupt.]

CATRON, Circuit Justice. This is an appeal from the district court of Missouri, in a case of bankruptcy, on the voluntary petition of the appellant to be discharged from his debts, on the surrender of his property, according to the act of congress of 1841 [5 Stat. 440]. The proceeding being in all respects regular, the petitioner moved for his discharge. The district court refused to grant such motion, "because it considered the act of congress under which said Klein asked to be discharged from all his debts as being against the constitution of the United States, and therefore the court had no power to grant such discharge."

The ground of this judgment the circuit court is called upon to revise. I am relieved from setting forth at any length the opinion of the district judge, because this has been already done, in an opinion delivered by me in the supreme court of the United States at its last term, when an attempt was made to bring the present question before that court to have it decided for the purposes of this case. By the constitution, congress is vested with power "to establish uniform laws on the subject of bankruptcies throughout the United States." The district judge was of opinion that the extent of the power is limited to the principle on which the English bankrupt system was founded; and to that system the convention referred, when it adopted the clause above recited, for its definition. That system provided a proceeding by a creditor against a debtor, who was a trader; a distribution of a bankrupt's effects equally among his creditors; and a discharge of the debtor from his contracts. obtaining the consent of a given majority of his creditors. That it was a proceeding for the benefit of creditors, the whole system being founded on the prin-

[1] [Reversing Case No. 7,866.]

ciple that a trader who owed debts in the various parts of the country, and was fraudulently making away with his property, instead of paying his debts with it, should have the property taken away and placed in the hands of trustees or other officers, with which his debts should be paid, and each of his creditors, whether present or absent, have his fair dividend, and that the bankrupt law of 1800 is a fair exposition of the constitutional provision. Briefly, that a bankrupt law was one by which honest creditors could force fraudulent debtors, who were traders, to surrender their property to pay ratably all their just debts; but that a law made solely and entirely for the benefit of debtors, and which enabled them at their own election to avoid their debts, was opposed to the whole intent, spirit, and object of a bankrupt law. I state this much of the grounds on which my brother judge's decree was founded from his printed opinion, because this case has not been argued on the part of the creditors, for whom no counsel appeared in this court, nor did there in the court below, as I am informed. The accuracy, industry, and unquestioned ability of the district judge have, I do not doubt, brought forward the best reasons that exist in support of the judgment he gave. The tenor and true spirit of the English bankrupt laws, such as they were when our federal constitution was adopted, he has given; and I agree with him that the act of 1841, in so far as it permitted the debtor, at his own sole election, to come into court and coerce an extinction of his debts, and abrogation of his contracts, contrary to the will of his creditors, was in violation of the leading principles on which the English laws were founded. Our law contemplated a proceeding by a debtor against his creditors, provided the debtor was insolvent. By the English law, the creditor alone could originate the proceeding; and it mattered not whether the defendant was insolvent or otherwise; if he did the fraudulent act, it made him a bankrupt,—a fraudulent trader. Then, by the English laws, "a fraudulent trader" could only be a bankrupt. With him as debtor, and with his creditors, could courts deal; and this at the election of the creditors, the debtor having no election to ask for distribution or for a discharge from his debts. If the power conferred on congress carries with it these restrictions, then the district court properly refused to discharge the applicant Klein, because the act of congress was unconstitutional in his case. But other and controlling considerations enter into the construction of the power. It is general and unlimited. It gives the unrestricted authority to congress over the entire subject, as the parliament of Great Britain had it, and as the sovereign states of this Union had it before the time when the constitution was adopted. To go no further: What was the power of the States on the subject of bankruptcies? They could, and constantly did, permit the debtor to come in voluntarily and surrender his property, and ask a discharge from his debts. The property was distributed generally among the creditors, and the debts of the petitioner annulled. Nor does the constitution prohibit the states from passing such laws. New York. Pennsylvania, Louisiana, and others now have them in full operation. The insolvent laws of Pennsylvania are in substance, and to a great extent in detail, similar to the act of congress of 1841, and no doubt furnished some of the ideas that were incorporated into the act. That Pennsylvania had power to pass these laws no one ever doubted, so far as she was not restricted by the constitution of the United States. The supreme court held, in the case of Ogden v. Saunders, 12 Wheat. [25 U. S.] 313, that the states retained the power and could exercise it by law, and that the law would operate to discharge the contract between debtor and creditor, they being inhabitants of the particular state at the date of the proceeding, if the contract had been made there after passing the law. In such case the parties contracted subject to the law, and it entered into the contract. The case of Boyle v. Zacharie, 6 Pet. [31 U. S.] 636, settled the contested question of power; and that it remained with the states to this limited extent. But the restrictions depend on general principles of international law and other parts of the constitution, especially that which prohibits the states from passing any law impairing the obligations of contracts, as will be seen by reference to the leading case on the subject of Sturges v. Crowninshield, 4 Wheat. [17 U. S.] 122. What the states might do before the adoption of the constitution may well be ascertained from what they now do in virtue of their respective powers. They may frame a bankrupt law in any form they see proper. This has never been questioned, so far as my knowledge extends. The controversies in the supreme court turned on the question whether the constitution inhibited the states (there being no acts of congress opposed to it) from legislating on the subject of bankruptcies, or whether the power was exclusive in congress. In the state tribunals the debtor comes involuntarily, and forces the creditor to prove his debt or be barred. One not a trader may apply. Neither is the consent of the creditors (or any portion of them) necessary to authorize a discharge from the contracts of the debtor. So he may have no property to divide, and many debts to annul, from which he seeks a discharge, and from which he is discharged. These powers clearly belonged to the state governments, before congress was invested with them, and this was done without limitation.

The district court relied confidently on the ground that congress can pass no law by violating contracts; and that the clause of the constitution conferred no such authority,

because the English bankrupt laws, by which the power is supposed to be restricted, only permitted the contract to be annulled at the election of four parts in five of the creditors in number and value; and therefore they annulled it by a new contract. This argument proceeds on the assumption that a proceeding in bankruptcy can only be had at the election of, and for the benefit of, creditors, and that every material step is their joint act, to which the debtor is compelled to submit. For the present it will only be necessary to say that one prominent reason why the power is given to congress was to secure to the people of the United States, as one people, a uniform law, by which a debtor might be discharged from the obligation of his contracts, and his future acquisitions exempted from his previous engagements; that the rights of debtor and creditor equally entered into the mind of the framers of the constitution. The great object was to deprive the states of the dangerous power to abolish debts. Few provisions in the constitution have had more beneficial consequences than this, and the kindred inhibition on the states that they should pass no law impairing the obligation of contracts. The inhabitants of states producing largely must be creditors; the inhabitants of those that are consumers will be debtors; bankrupt laws of the latter states might ruin the producers and creditors, they having no interest or power in the government of the consuming states, and, it being the interest of the latter to annul the debts of nonresidents, no remedy would exist for the grossest oppression. No laws of relief would be more effectual in times of pressure by foreign creditors, nor more likely to be adopted. If one state adopted such a measure, it would furnish a fair occasion for others to do the same, on the plausible pretext of self-defense; others would be forced into a similar bad policy, until discredit and ruin would overspread the entire land, by an extinction of all debts, and a consequent prostration of morals, public and private, on the subject of contracts. This evil had to a certain extent occurred, and was fresh in the minds of the framers of the constitution, and no doubt it would again occur in some of the states, but for the provisions under consideration standing in the way of abrogating the private contracts of nonresidents. But if congress passed the law it must be uniform throughout the United States. Then the entire people are equally represented, and have the power to protect themselves against hasty and mistaken legislation by its repeal, if found oppressive in practice.

Legislation by congress on the subject of bankruptcies is of much less consequence than its prohibition on part of the states. They can pass no law affecting a nonresident, because no jurisdiction exists of his person. They can impair no contract made out of the state, because it was not made subject to the state insolvent law. The power, as it stands restricted by the decision in Ogden v. Saunders, is almost harmless. Those whom the state bankrupt law can most affect have the popular vote in the state legislature, and may repeal the law. The foreigner has little interest in its existence, as he cannot be affected by it, further than that the debtor may be deprived of his property. Another reason why congress was vested with the power was to prevent dangerous conflicts of jurisdiction among the states. A discharge in one sovereignty from contracts is by the laws of nations not recognized as a discharge in another sovereignty, save on the grounds of comity. An assignee under the British bankrupt laws is not recognized in this country as owner of the debts of the bankrupt, and an attaching creditor or the government may disregard a title set up by the foreign assignee. Harrison v. Sterry, 5 Cranch [9 U. S.] 298. The states in this respect are foreign to each other, and would be little likely to extend comity to the discharge of each other, from which great confusion might follow, and much ill will.

In considering the question before me, I have not pretended to give a definition, but purposely avoided any attempt to define the mere word "bankruptcy." It is employed in the constitution in the plural and as part of an expression,—"the subject of bankruptcies." The ideas attached to the word in this connection are numerous and complicated. They form a subject of extensive and complicated legislation. Of this subject congress has general jurisdiction; and the true inquiry is, to what limits is that jurisdiction restricted? I hold it extends to all cases where the law causes to be distributed the property of the debtor among his creditors; this is its least limit. Its greatest is a discharge of the debtor from his contracts. And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject—distribution and discharge—are in the competency and discretion of congress. With the policy of a law, letting in all classes, others as well as traders, and permitting the bankrupt to come in voluntarily, and be discharged without the consent of his creditors, the courts have no concern; it belongs to the law makers. I have spoken of the state bankrupt laws. I deem every state law a bankrupt law, in substance and fact, that causes to be distributed by a tribunal the property of a debtor among his creditors; and it is especially such if it causes the debtor to be discharged from contracts within the limits prescribed by the case of Ogden v. Saunders [supra]. Such a law may be denominated an insolvent law. Still it deals directly with the subject of bankruptcies, and is a bankrupt law, in the sense of the constitution; and, if congress should pass a similar law,

it would suspend the state law, while the act of congress continued in force. This court deeming the act of 1841 constitutional, it is ordered, that the decree of the district court [Case No. 7,866] dismissing the proceeding be reversed, and the petitioner (Klein) be discharged from his debts, and receive his certificate. The same order is directed in the case of Christopher Rhodes; dismissed also on constitutional grounds by the district court.